# **EXHIBIT B**

# WORKERS FEDERAL CREDIT UNION
# SPLIT DOLLAR AGREEMENT

This **Split Dollar Agreement** between **Workers Federal Credit Union** and **Douglas Jay Petersen** is effective as of December 1, 2021.

### INTRODUCTION

Petersen is a valuable employee of the Credit Union. To encourage him to continue employment, the Credit Union will fund an amount to pay Premiums on a life insurance policy that he will own. The life insurance policy secures the Credit Union's right to recover the funding amount plus interest.

### AGREEMENT

The parties agree as follows:

### Article 1
### Definitions

In this agreement, the following definitions apply:

1.1 "**Access Date**" means August 1, 2026, i.e., Petersen's 65th birthday.

1.2 "**Administrator**" means either (i) the Board, or (ii) the committee, individual (other than Petersen) or other designee of the Board. The Administrator acts for the Credit Union and is the named fiduciary for this agreement. The Administrator has sole and absolute authority to exercise any discretion or judgment under the agreement.

1.3 "**Annual Borrowing Cap**" means the amount determined under Section 4.2.

1.4 "**Board**" means the Credit Union's Board of Directors.

1.5 "**Borrowing Year**" means each consecutive 12-month period after borrowing rights begin under Section 4.1. Borrowing projections assume 20 Borrowing Years. For subsequent Borrowing Years, each Borrowing Year is assumed to be the last.

1.6 "**Cause**" means any of the following that results in a material adverse effect on the Credit Union: (i) the violation of any law, rule or regulation (other than a minor traffic violation or similar violation); (ii) the violation of any Credit Union rule or policy; (iii) gross negligence in the performance of duties; (iv) intentional failure to perform duties; or (v) a breach of fiduciary duty.

1.7 "**Change of Control**" means the Credit Union's acquisition of, consolidation with, or merger into any other entity where fewer than 51% of the members of the surviving entity's board of directors were members of the Board prior to the change.

1.8 "**Collateral Assignment**" means the collateral assignment attached as Exhibit B.

1.9 "**Disability**" means (i) Petersen, by reason of any medically determinable physical or mental impairment that can be expected to result in death or to last for a continuous period of not less than 12 months, either (A) being unable to engage in any substantial gainful activity, or (B) receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Credit Union; or (ii) the Social Security Administration determining that Petersen is totally disabled.

1.10 "**Funding Accounts**" means the Premium Deposit Account and the Side Account.

1.11 "**Funding Amount**" means $12,000,000.

1.12 "**Funding Date**" means the date the Credit Union pays the Funding Amount into the Side Account as described in Article 2.

1.13 "**Good Reason**" means any of the following occurring without Petersen's consent, subject to the notice requirement and cure period described at the end of this Section:

   1.13.1 A material diminution in his base compensation from the most current level;

   1.13.2 A material diminution in his duties, responsibilities, or authority;

   1.13.3 A material change of the geographic location at which he must perform the services; or

   1.13.4 Any other action or inaction that constitutes a material breach by the Credit Union of any employment or other agreement under which he provides services to the Credit Union.

Prior to an event qualifying as Good Reason, Petersen must give written notice to the Credit Union within 90 days after the initial occurrence of the event, and the Credit Union will have 30 days after receiving the written notice to remedy the condition. If the Credit Union fails to remedy the condition during the 30-day period, then Good Reason exists for six months from the end of that period.

1.14 "**Insureds**" means Petersen and the Joint Insured.

1.15 "**Insurer**" means Minnesota Life Insurance Company.

1.16 "**Joint Insured**" means Lisa Petersen.

1.17 "**Outstanding Balance**" means (i) the Funding Amount, plus (ii) the compound interest accrued on the Funding Amount from the Funding Date, less (iii) any payment to the Credit Union under Section 5.1. Interest generally accrues at an annual rate of 1.90%, the long-term applicable federal rate under 26 U.S.C. § 1274(d) in effect on the Funding Date. The rate is based on the Insureds' joint life expectancy and annual compounding, as provided in 26 C.F.R. § 1.7872-15(e)(5)(ii)(C). The rate changes for any portion of the Funding Amount that becomes subject to the Credit Union's lifetime recovery right, as described in Section 5.1.

1.18 "**Policy**" means life insurance policy number 3049332W issued by the Insurer.

1.19 "**Premium**" means each of six annual Premiums of $2,047,320.

1.20 "**Premium Deposit Account**" means the account established at the Insurer from which the second through sixth Premiums on the Policy will be paid as described in Article 2 and Section 3.2.

1.21 "**Record-Keeper**" means Gallagher or other third-party record-keeper that the Credit Union selects from time to time in connection with this agreement.

1.22 "**Side Account**" means the account established at the Credit Union that is subject to the Side Account Assignment from which amounts will be distributed to Petersen to assist in paying taxes due as described in Section 8.3.

1.23 "**Side Account Assignment**" means the Side Account Assignment attached as Exhibit C.

1.24 "**Total Projected Loans**" means $6,295,720.

1.25 "**Vesting Start Date**" means January 1, 2011.

### Article 2
### Funding

2.1 **Generally**. On the Funding Date, the Credit Union will deposit the Funding Amount into the Side Account to be distributed as follows:

| | |
|---|---:|
| Initial Premium funding | $2,047,320 |
| Premium Deposit Account funding | $9,720,380 |
| Tax distribution funding (see Section 8.3) | $232,300 |
| Total Funding Amount | $12,000,000 |

2.2 **No Additional Funding**. The Credit Union is not obligated to pay any additional amounts into the Policy or Funding Accounts.

### Article 3
### Policy & Account Interests

3.1 **Policy**. Except as otherwise provided in this agreement, Petersen is the sole and absolute owner of the Policy and may exercise all ownership rights the Policy grants to the owner, but only to the extent those rights do not adversely affect the Credit Union's right to be paid the Outstanding Balance and any additional death proceeds described in Section 7.1. For example, Petersen may not change the indexed account or loan interest rate options without the Credit Union's written consent.

3.2 **Funding Accounts**. Petersen owns the Funding Accounts but assigns them to the Credit Union so that, among other things, no distributions can be made without the Credit Union's consent. The Credit Union hereby consents in advance to Premiums being paid from the Premium Deposit Account as they come due and to distributing taxes from the Side Account as described in Section 8.3.

3.3 **Restrictions on Transfer**. Except as otherwise provided in Article 4, Petersen may not sell, assign, transfer, pledge, borrow against, surrender or cancel the Policy or Funding Accounts without the Credit Union's express written consent.

3.4 **Security**. The Credit Union's rights under this agreement are secured by the Collateral Assignment and Side Account Assignment. Petersen may not terminate, alter or amend those contracts without the Credit Union's written consent. The Credit Union's interests in the Policy and Funding Accounts are superior to those of any creditor of Petersen or any other individual or entity. If the terms of this agreement and the terms of the Collateral Assignment

or Side Account Assignment conflict, the terms of this agreement control.

**3.5 Joint Insured's Interests.** If Petersen predeceases the Joint Insured without having forfeited rights under Section 4.4, then upon his death and subject to the Credit Union's rights under this agreement, the ownership of the Policy and of the Funding Accounts (if any), and all of his rights (such as the borrowing and tax withdrawal rights) and obligations under this agreement, transfer to the Joint Insured.

## Article 4
## Borrowing Rights

**4.1 Generally.** Subject to vesting as described in Section 4.3, commencing on Petersen's termination of employment, Petersen can borrow each Borrowing Year against the cash value of the Policy up to the vested Annual Borrowing Cap. (For example, if Petersen were 20% vested, Petersen could borrow 20% of the Annual Borrowing Cap.) Petersen may not borrow in the aggregate more than the vested percentage of the Total Projected Loans.

**4.2 Annual Borrowing Cap.** The Annual Borrowing Cap is as follows, depending on Petersen's vested percentage as determined under Section 4.3:

**4.2.1 100% Vesting.** If Petersen is fully vested, the Annual Borrowing Cap is the amount Petersen is projected to be able to borrow from the Policy each remaining Borrowing Year without causing, immediately or as projected through the Insureds' joint life expectancy, (i) the death proceeds from the Policy at any time to be less than the Outstanding Balance, or (ii) the Policy to lapse. This number varies from year to year depending on Policy performance, but may only exceed $314,786 to the extent borrowing in previous years was limited under the preceding sentence.

**4.2.2 Partial Vesting.** If Petersen is partially vested, the Annual Borrowing Cap is the vested percentage times the lesser of (i) the Annual Borrowing Cap determined under Section 4.2.1, or (ii) $314,786. This number is calculated once upon Petersen's termination of employment and does not change from year to year; provided, however, the number will be reduced if and as necessary to assure that as projected through Petersen's life expectancy, (a) the death proceeds from the Policy will not at any time be less than the Outstanding Balance, and (b) the Policy will not lapse.

**4.2.3 Calculation.** The Credit Union calculates the Annual Borrowing Cap as described in Article 6.

**4.3 Vested Annual Borrowing Cap.** Petersen vests in the right to borrow from the Policy up to the Annual Borrowing Cap as follows:

**4.3.1 Full Vesting.** Petersen becomes 100% vested in the Annual Borrowing Cap upon (i) remaining employed with the Credit Union to the Access Date, (ii) termination of employment for death or Disability, (iii) termination of employment for Good Reason, or (iv) involuntary termination of employment (for reasons other than Cause) within 24 months after a Change of Control.

**4.3.2 Partial Vesting.** Petersen is partially vested upon termination of employment for reasons other than Cause prior to an event specified in Section 4.3.1. Petersen's vested percentage is determined by dividing (i) the number of complete months from the Vesting Start Date to the date of termination of employment, by (ii) the number of complete months from the Vesting Start Date to the Access Date.

**4.4 Rights Forfeiture.** Petersen forfeits all unexercised borrowing rights upon the Credit Union terminating his employment for Cause.

**4.5 Joint Insured's Rights.** If Petersen predeceases the Joint Insured before forfeiture under Section 4.4, the Joint Insured can start borrowing anytime, whether before or after the Access Date.

## Article 5
## Payments to Credit Union

**5.1 Partial Vested Termination.** If Petersen's employment with the Credit Union terminates and he is only partially vested in the borrowing rights, the Credit Union will have a one-time right to borrow or withdraw (and retain as early repayment of a portion of the Outstanding Balance) up to the maximum amount of the Policy cash value and Funding Accounts that (i) does not put at risk either Petersen's ability to borrow the vested percentage of the Annual Borrowing Cap or the ability of the Policy to remain in effect through the Insureds' joint life expectancy, and (ii) allows Petersen to still receive from the Side Account annual amounts sufficient to pay taxes on the Premium Deposit Account interest income as adjusted by the withdrawal. In connection with the borrowing or withdrawal, the Credit Union can also reduce the Policy's face amount so long as the protections in the preceding

sentence are met. This right to borrow or withdraw expires 365 days after Petersen's termination of employment, or when the Credit Union makes its withdrawal, whichever comes first. The Credit Union calculates the borrowing or withdrawal amount, and determines whether to reduce the face amount of the Policy, as described in Article 6.

**5.1.1 Demand Loan.** The calculated maximum amount will be treated as a demand loan during the time in which the Credit Union may withdraw the funds. The remaining portion of the original loan will continue to be subject to the original rate under Section 1.17. This demand loan will accrue interest at the blended annual rate as provided in 26 C.F.R. § 1.7872-15(e)(3) until the Credit Union's withdrawal right expires.

**5.1.2 Term Loan.** At the expiration of the Credit Union's withdrawal right, any portion of the maximum amount that the Credit Union did not borrow or withdraw will convert back to a term loan repayable upon the death of both Insureds. The interest rate for this portion is the long-term applicable federal rate in effect upon the expiration of the withdrawal right.

**5.2 Non-Recourse.** The Policy, the Premium Deposit Account, and the Side Account are the sole sources for the payments to the Credit Union under this agreement. The Insureds and their estates, heirs, and beneficiaries are not personally obligated to pay the Outstanding Balance.

**5.3 Ordering of Payments.** All payments to the Credit Union are first applied to accrued but unpaid interest.

### Article 6
### Calculations/Adjustments

**6.1 Generally.** Under the conditions described in Article 4 and Article 5, the Credit Union is to calculate the Annual Borrowing Cap, the amount to be withdrawn and paid to the Credit Union, and the reduced face amount of the Policy. The Record-Keeper will assist the Credit Union with the calculations. The calculations will be based on in-force illustrations for the Policy, on assumptions described in Section 6.2, and on the limitation described in Section 6.3.

**6.2 Assumptions.** The assumptions for the calculations will be as follows:

**6.2.1 Charges.** Mortality and other charges inside the Policy will continue at the rate in effect on the date of the calculation.

**6.2.2 Earnings Rate.** The Policy's cash value will grow at a rate equal to the lesser of (i) 5.25% (rate assumed in the original illustration), or (ii) the maximum illustration rate the Insurer allows on the date of the calculation.

**6.2.3 Life Expectancy.** The Insureds' joint life expectancy is treated as age 99 for calculation purposes to ensure the death benefit remains sufficient to repay the Outstanding Balance.

**6.2.4 Others.** Any other necessary assumptions the Credit Union deems reasonable.

**6.3 Withdrawal/Reduced Face Amount Limitation.** In calculating the withdrawal amount and/or the reduction in the Policy's face amount under Section 5.1, the Credit Union will assume the Annual Borrowing Cap is 125% of the actual Annual Borrowing Cap under Section 4.2.2.

### Article 7
### Death Proceeds

**7.1 Allocation.** If Petersen forfeits all borrowing rights under Section 4.4, all death proceeds of the Policy and any Funding Account balances are payable to the Credit Union. Otherwise, upon the death of both Insureds, the proceeds under the Policy and any Funding Account balances will be allocated as follows:

7.1.1 First, the Outstanding Balance to the Credit Union;

7.1.2 Second, to Petersen's beneficiary, any unborrowed portion of the vested Total Projected Loans;

7.1.3 Third, any remaining proceeds and balances up to $6,000,000 divided equally between Petersen's beneficiary and the Credit Union; and

7.1.4 Fourth, any remaining proceeds and balances to the Credit Union.

**7.2 Payments.** The Credit Union's portion of the death proceeds and Funding Account balances will be paid in a lump sum as soon as possible after the death of both Insureds. The portion payable to Petersen's beneficiary will be paid by the Insurer as soon as possible after the Credit Union receives its payments.

### Article 8
### Tax Matters

**8.1 Tax Characterization.** Because Petersen owns the Policy, the arrangement is treated for tax purposes under

the "loan regime" rules in 26 U.S.C. § 7872 and 26 C.F.R. § 1.7872-15. This "loan" characterization for tax purposes does not control for any other purpose.

**8.2 Written Representation.** To avoid "contingent payment" treatment of the loan under 26 C.F.R. § 1.7872-15, Petersen will attach to his income tax return for 2021 an executed copy of the written representation in Exhibit A.

**8.3 Interest.** Any taxable earnings generated by the Funding Accounts are taxable to Petersen. As described in the Side Account Assignment, he will receive annual distributions from the Side Account to assist in paying the taxes due on the taxable earnings.

### Article 9
### Amendment and Termination

**9.1 Amendment.** This agreement may be amended only by the written agreement of the Credit Union and Petersen.

**9.2 Termination.** The parties may terminate this agreement by a joint written agreement at any time. Otherwise, upon termination of Petersen's employment with a forfeiture of borrowing rights under Section 4.4, this agreement will terminate on the "full recovery date." The full recovery date is the first day that the sum of the Funding Account balances and the cash surrender value of the Policy equals or exceeds the Outstanding Balance plus any income taxes Petersen incurs in transferring the Policy to the Credit Union (e.g., taxes on any gain in the Policy). On the full recovery date, the parties will withdraw and pay to Petersen the income tax amount and then transfer the Funding Accounts, the Policy, and Policy values (even if greater than the Outstanding Balance) to the Credit Union. Tax withdrawals by Petersen (or after his death, by the Joint Insured) under Section 8.3 continue as needed until the Credit Union recovers the Outstanding Balance.

### Article 10
### Claims and Review Procedures

Claims for a death benefit under the Policy or other Policy contract issues will be processed by the Insurer under the Insurer's claims procedures. Claims and appeals for benefits under the agreement will be made and processed under the procedures described in Sections 10.1 and 10.2, subject to the adjustments referred to in Sections 10.3, 10.4 and 10.5 for Disability claims and appeals.

**10.1 Claims Procedure**

**10.1.1 Initiation – Written Claim.** The claimant initiates a claim by submitting to the Administrator a written claim for the benefits.

**10.1.2 Timing of Administrator Response.** The Administrator must respond to such claimant within 90 days after receiving the claim. If the Administrator determines that special circumstances require additional time for processing the claim, the Administrator can extend the response period by an additional 90 days by notifying the claimant in writing, prior to the end of the initial 90-day period, that an additional period is required. The notice of extension must set forth the special circumstances and the date by which the Administrator expects to render its decision.

**10.1.3 Notice of Decision.** If the Administrator denies part or all of the claim, the Administrator must notify the claimant in writing of such denial. The Administrator must write the notification in a manner calculated to be understood by the claimant. The notification will set forth:

- The specific reasons for the denial,
- A reference to the specific provisions of the agreement on which the denial is based,
- A description of any additional information or material necessary for the claimant to perfect the claim and an explanation of why it is needed,
- An explanation of the agreement's review procedures and the time limits applicable to such procedures, and
- A statement of the claimant's right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on review.

**10.2 Review Procedure.** If the Administrator denies part or all of the claim, the claimant will have the opportunity for a full and fair review by the Administrator of the denial, as follows:

**10.2.1 Initiation – Written Request.** To initiate the review, the claimant, within 60 days after receiving the Administrator's notice of denial, must file with the Administrator a written request for review.

**10.2.2 Additional Submissions – Information Access.** The claimant will then have the opportunity to submit

written comments, documents, records and other information relating to the claim. The Administrator will also provide the claimant, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant (as defined in applicable ERISA regulations) to the claimant's claim for benefits.

10.2.3 **Considerations on Review**. In considering the review, the Administrator must take into account all materials and information the claimant submits relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

10.2.4 **Timing of Administrator Response**. The Administrator must respond in writing to such claimant within 60 days after receiving the request for review. If the Administrator determines that special circumstances require additional time for processing the claim, the Administrator can extend the response period by an additional 60 days by notifying the claimant in writing, prior to the end of the initial 60-day period, that an additional period is required. The notice of extension must set forth the special circumstances and the date by which the Administrator expects to render its decision.

10.2.5 **Notice of Decision**. The Administrator must notify the claimant in writing of its decision on review. The Administrator will write the notification in a manner calculated to be understood by the claimant. The notification must set forth:

- The specific reasons for the denial,

- A reference to the specific provisions of the agreement on which the denial is based,

- A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant (as defined in applicable ERISA regulations) to the claimant's claim for benefits, and

- A statement of the claimant's right to bring a civil action under ERISA Section 502(a).

10.3 **Disability Claim Procedure**. To the extent a claim for benefits submitted under Section 10.1 involves the issue of whether a Disability has occurred:

10.3.1 **Initial Response Period**. The initial period for response under Section 10.1.2 is reduced from 90 days to 45 days.

10.3.2 **Extended Response Period**. The Administrator may extend the 45-day response period by up to 30 days if necessary due to matters beyond the Administrator's control and if the Administrator gives notice to the claimant of the extension before the end of the initial 45-day period. A second 30-day extension is available by notice to the claimant before the end of the initial 30-day extension. Any notice of extension must specifically explain the standards on which entitlement to the benefit is based, the unresolved issues that prevent a decision on the claim, and the additional information needed to resolve those issues. The claimant will have at least 45 days within which to provide the specified information.

10.4 **Disability Review Procedure**. To the extent a review of a claim under Section 10.2 involves the issue of whether a Disability has occurred:

10.4.1 **Initial Response Period**. The initial time period for response under Section 10.2.4 is reduced from 60 days to 45 days.

10.4.2 **New/Additional Evidence**. The Administrator will provide the claimant (free of charge) any new or additional evidence considered, relied upon, or generated by the Administrator, insurer, or other person making the benefit determination (or at the direction of the Administrator, insurer or such other person) in connection with the claim; such evidence must be provided as soon as possible and sufficiently in advance of the date on which the Administrator is required to respond under Section 10.2.4 (as modified under Section 10.4.1) to give the claimant a reasonable opportunity to respond to the evidence; and

10.4.3 **New/Additional Rationale**. Before an adverse benefit determination on a Disability benefit claim is issued after a review based on a new or additional rationale, the Administrator will provide the claimant (free of charge) the rationale. The rationale will be provided as soon as possible and sufficiently in advance of the date on which the Administrator is required to respond under Section 10.2.4 (as modified under Section 10.4.1) to give the claimant a reasonable opportunity to respond to the rationale.

**10.5 Adverse Disability Benefit Determinations.** Any adverse benefit decision regarding a Disability will be provided in a culturally and linguistically appropriate manner (as described in 29 C.F.R. § 2560.503-1(o)). The claim or appeal will be adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision, and will include:

**10.5.1 Explanation of Decision.** A discussion of the decision, including an explanation of the basis for disagreeing with or not following: (a) the views presented by the claimant to the Administrator of health care professionals treating the claimant and vocational professionals who evaluated the claimant; (b) the views of medical or vocational experts whose advice was obtained on behalf of the Administrator in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination; and (c) a disability determination regarding the claimant presented by the claimant to the Administrator made by the Social Security Administration;

**10.5.2 Explanation of Scientific/Clinical Judgment.** If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the agreement to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request; and

**10.5.3 Internal Rules.** Either the specific internal rules, guidelines, protocols, standards or other similar criteria of the agreement relied upon in making the adverse determination or, alternatively, a statement that such rules, guidelines, protocols, standards or other similar criteria of the agreement do not exist.

### Article 11
### Miscellaneous

**11.1 Notice.** Any communication to a party required or permitted under this agreement must be in writing and will be deemed to have been given when it is delivered if delivered personally or sent by overnight courier addressed to the party at the address listed on Exhibit A. Either party may specify a new address by written notice to the other party.

**11.2 Annual Review.** The Credit Union will retain the Record-Keeper or another third party on at least an annual basis, or more often as needed based on investment performance, regulatory changes, etc., to review the split dollar life insurance arrangement represented by this agreement. The Credit Union will pay the cost of such reviews.

**11.3 Binding Effect.** This agreement is binding upon and inures to the benefit of the Credit Union and its successors and assigns and the Insureds' successors, assigns, heirs, executors, administrators, and any Policy beneficiary.

**11.4 Entire Agreement.** This agreement constitutes the entire agreement between the Credit Union and Petersen as to the subject matter hereof. No rights are granted to Petersen by virtue of this agreement other than those specifically set forth herein.

**11.5 Governing Law.** Except as may be preempted by the laws of the United States of America, this agreement and the rights of the parties hereunder are governed by the laws of Massachusetts without regard to its conflict rules.

**11.6 Compliance Intent.** The parties intend that this agreement be compliant with any applicable legal and regulatory requirements in effect on the agreement's effective date. It shall be interpreted and applied accordingly.

**11.7 Insurer Not a Party.** The Credit Union and Petersen acknowledge that the Insurer is not a party to this agreement for any purpose nor in any way responsible for its validity, is not obligated to inquire as to the distribution of any moneys it pays under the Policy, and will be fully discharged from any and all liability under the terms of the Policy upon payment or other performance of its obligations in accordance with the terms of the Policy and the Collateral Assignment.

**11.8 Validity.** If any provision of this agreement is determined to be illegal or invalid for any reason, the illegality or invalidity does not affect the remaining terms, but this agreement will be construed and enforced as if such illegal and invalid provision had never been inserted.

**11.9 Additional Documents.** Each party will perform all further acts and execute, acknowledge, and deliver any documents that may be reasonably necessary, appropriate, or desirable to carry out the provisions of this agreement.

**11.10 Waiver of Rights.** If a party does not enforce or if it waives any right it may have under this agreement, such non-enforcement or waiver does not preclude the party from subsequently enforcing such rights.

**11.11 No Guarantee of Employment.** Nothing contained in this agreement gives Petersen any rights to employment or to continued employment with the Credit Union.

**11.12 Independent Representation.** Petersen acknowledges being advised to receive independent professional representation regarding the tax implications of this agreement.

**11.13 Death Without Coverage.** If Petersen or the Joint Insured dies before the Policy has been issued, or if the Policy is voided (e.g., due to suicide or misrepresentations), the Credit Union is released from all liability under this agreement and can immediately recover all values available from the Insurer and the Funding Accounts.

**11.14 Counterparts.** The parties sign two copies of this agreement so that each retains an original. The two executed copies constitute one and the same agreement.

The parties are signing this agreement on the dates below.

**Executive:**

_____
**DOUGLAS JAY PETERSEN**
Date Signed: _____12/14_____, 2021


**Credit Union:**
**WORKERS FEDERAL CREDIT UNION**

By _____Mary Healy_____
Title _____Board Chair_____
Date Signed: _____12/21_____, 2021

**EXHIBIT A**
(For filing with Petersen's Form 1040)
REPRESENTATION UNDER 26 C.F.R. § 1.7872-15(d)(2)
REGARDING NONRECOURSE SPLIT DOLLAR LOAN

**Employee:**  Douglas Jay Petersen
47 Westview Road
Brookline, NH 03033

SSN: REDACTED

**Employer:**  Workers Federal Credit Union
815 Main Street
Fitchburg, MA 01420

EIN: 04-2079901

The Employer has paid one or more Premiums into a life insurance policy owned by the Employee. The Premiums are treated for tax purposes as nonrecourse split dollar loans under 26 C.F.R. § 1.7872-15.

The Employer and Employee represent that a reasonable person would expect that the Employer will be paid all of its premium payments.

**Employee:**

_[signature]_
**DOUGLAS JAY PETERSEN**

**Employer:**
**WORKERS FEDERAL CREDIT UNION**

By _[signature] Mary Heafy_
Title _Board Chair_

---

**Note:** Current IRS regulations require the following:

1. The employer and the employee **must each sign this representation not later than** the last day (including extensions) for filing the employee's Federal income tax return for 2021.

2. The employer and the employee **must each keep an original signed copy** of this representation as part of their books and records.

3. The employee **must attach a copy of this representation** to his income tax return for 2021.

**EXHIBIT B**
**ASSIGNMENT OF POLICY AS COLLATERAL**

| | |
|---|---|
| Insurance Company: | Minnesota Life Insurance Company (the "Insurance Company") |
| Policy Number: | 3049332W (the "Policy") |
| Policy Owner: | Douglas Jay Petersen (the "Owner") |
| Name of Insureds: | Douglas Jay Petersen and Lisa Petersen |
| Name of Assignee: | Workers Federal Credit Union (the "Assignee") |
| Address of Assignee: | PERSONAL & CONFIDENTIAL<br>ATTN: Douglas Jay Petersen, Chief Executive Officer<br>815 Main Street<br>Fitchburg, MA 01420 |

Split Dollar Agreement dated December 1, 2021 (the "Agreement")

The Owner hereby collaterally assigns and transfers to Assignee and to Assignee's representatives, successors and assigns, as the Assignee's interest may appear in the Agreement, the rights and interests specified in this Assignment of the Owner in and to the Policy (and any supplementary contracts issued with the Policy such as a premium deposit account). This Assignment is subject to the terms and conditions of the Policy and to any prior assignments and superior liens the Insurance Company or any other party may have against the Policy.

The Owner and the Assignee agree that:

1. This Assignment is made and the Policy is held as collateral security for all current and future liabilities and obligations of the Owner to the Assignee under the Agreement.

2. This Assignment includes only the following specific rights, which rights the Assignee may exercise only at the time or times specified in, and to the extent allowed by, the Agreement, and subject to paragraph 4 of this Assignment:

   a. the right to partially or completely surrender the Policy for its cash surrender value; and

   b. the right to receive the net proceeds of the Policy payable due to death or maturity.

3. The following are examples of rights retained by the Owner and not included in this Assignment:

   a. the right to receive from the Insurance Company any disability benefits, if applicable;

   b. the right to designate and change the beneficiary(s) of the Policy;

   c. the right to elect any optional mode of settlement permitted by the Policy or allowed by the Insurance Company;

   d. the right to exercise, free from this Assignment, any option to purchase additional insurance or policies.

   The reservation of these rights does not impair (i) the Assignee's right under paragraph 2 to surrender the policy partially or completely, or (ii) any other Assignee rights under this Assignment.

4. Prior to exercising any right specified in paragraph 2 of this Assignment, the Assignee will give 20 days' advance notice to the Owner (delivered personally or sent by overnight courier addressed to the Owner) of its intention to exercise that right.

5. Subject to the terms of this Assignment, the Owner retains and possesses all incidents of ownership in the Policy; provided, however, the Owner covenants not to partially or completely surrender or cancel the Policy, obtain a withdrawal or loan from the Policy, or assign the Owner's interest in the Policy, without the written authorization and consent of the Assignee.

6. The Insurance Company may require any claims of the Assignee to be made by affidavit.

7. The Insurance Company is not a party to the Agreement and has no obligation or liability with respect to the agreement. The Insurance Company is authorized to recognize and act upon any Assignee claim without investigating the reason or right for such claim, the existence or validity of any liabilities or obligations or any default under the terms of the Agreement, or the

application or use by the Assignee of any amounts it receives under this Assignment.

The Owner represents there are no bankruptcy or insolvency proceedings pending against the Owner, and the Owner's property is not subject to any assignment for the benefit of creditors.

The Owner understands (i) this Assignment is not binding on the Insurance Company unless acknowledged by a registrar or other officer, and (ii) that the Insurance Company assumes no responsibility for the validity or effect of this Assignment.

Owner: _____ [signature] _____
DOUGLAS JAY PETERSEN

Date Signed: __12/14__, 2021

**FOR INSURANCE COMPANY USE ONLY**

This Assignment was received and filed by the Insurance Company on the date below.

Date: _____

Signed: _____

Title: _____

THIS ASSIGNMENT IS SUBJECT TO:
1. THE TERMS OF THE POLICY
2. ANY INTEREST OF THE POLICY
3. INTEREST OF ANY PRIOR ASSIGNEE

WHEN SUBMITTING CLAIM, ASSIGNEE MUST PROVIDE INTEREST AND EXTENT THEREOF:

DUPLICATE RECEIVED AND FILED
MINNESOTA LIFE INSURANCE COMPANY
ST. PAUL MN 55101

_Melissa Werth_ 12/22/2021
REGISTRAR

2

**EXHIBIT C**
**WORKERS FEDERAL CREDIT UNION**
SIDE ACCOUNT ASSIGNMENT

| | |
|---|---|
| Account Number: | _____ [insert when Side Account is established] (the "Side Account") |
| Initial Balance: | $12,000,000 |
| Side Account Owner: | Douglas Jay Petersen |
| Name of Assignee: | Workers Federal Credit Union |
| Address of Assignee: | 815 Main Street, Fitchburg, MA 01420 |
| Split Dollar Agreement dated December 1, 2021 (the "Agreement") | |

This **Side Account Assignment** between **Workers Federal Credit Union** and **Douglas Jay Petersen** connects to the Agreement and is effective as of December 1, 2021.

This assignment sets forth instructions for distributing the funds received as well as restrictions on, and rights to, the Side Account's values. This assignment is made a part of the Agreement. Capitalized terms not defined in this assignment are defined in the Agreement.

The Side Account holds funds to pay the initial Premium on the Policy, to fund the Premium Deposit Account, and to distribute to Petersen amounts to assist in paying the income taxes due on taxable income the Funding Accounts generate. These funds are escrowed funds for him to use solely for these purposes.

The parties agree as follows:

1. **Exclusive Access.** Except as provided in this Assignment, Petersen may not withdraw funds from the Side Account or assign its values.

2. **Funding Date Distributions.** On the Funding Date, the parties will pay to the Insurer (i) the initial Premium and (ii) the Premium Deposit Account funding amount described in Section 2.1 of the Agreement.

3. **Annual Tax Withdrawals.** With the remaining funds, on or before April 15 of the years specified below, so long as the Agreement has not terminated under Section 9.2, the parties will distribute to Petersen the amounts specified below to assist in paying the federal, state, and local income taxes he is required to pay on any taxable income the Premium Deposit Account generated during the preceding calendar year. The interest income listed below is believed to be accurate, but the actual interest income will be listed on the IRS Form 1099 issued by the Insurer each year. The distribution amounts assume a combined income tax rate of 45.00%. The distributions will not be adjusted to reflect the actual rate of taxation or any variations in the reportable income:

| By April 15 of | Interest Income from Premium Deposit Account | Tax Distribution |
|---|---|---|
| 2022 | $0 | $0 |
| 2023 | $35,212 | $15,845 |
| 2024 | $69,818 | $31,418 |
| 2025 | $103,829 | $46,723 |
| 2026 | $137,255 | $61,765 |
| 2027 | $170,107 | Remaining Funds |

4. **Joint Insured.** If Petersen predeceases the Joint Insured, then upon his death the Joint Insured replaces him as Owner of the Side Account, as described in Section 3.5 of the Agreement.

5. **Partial Repayments.** If the partial repayment provisions of Section 5.1 of the Agreement apply, the Credit Union will withdraw a portion of the Side Account balance as it determines under the terms of Section 5.1.

6. **Beneficiary.** After both Insureds have died, any remaining Side Account balance will be paid as described in Section 7.1 of the Agreement.

7. **Agreement Termination.** If the Agreement is terminated by the parties' joint agreement, the Side Account will be distributed according to that agreement. Otherwise, upon termination of the Agreement, the Credit Union will withdraw and retain all funds from the Account.

8. **Cooperation.** The parties agree for themselves and their successors to sign any additional withdrawal or other documentation necessary to effect the terms of this Assignment.

9. **Security Interest, Priority, & Control.** The funds in the Side Account are escrowed funds and are not Petersen's unrestricted assets. To the extent the funds are not escrowed funds, Petersen hereby grants a security interest in the Side Account to the Credit Union. The Credit Union is in possession of the Side Account, and therefore has "control" of the Side Account pursuant to the Uniform Commercial Code, and may use the funds pursuant to the Agreement. Petersen's creditors, beneficiaries and estate have no interest in the Side Account or escrowed funds.

10. **Inconsistency.** If this assignment conflicts with the Agreement, the Agreement controls.

**Executive:**

_____
**DOUGLAS JAY PETERSEN**
Date Signed: _____12/14_____, 2021

**Credit Union:**
**WORKERS FEDERAL CREDIT UNION**

By _____Mary Healy_____
Title _____Board Chair_____
Date Signed: _____12/21_____, 2021

2