# EXHIBIT D

Douglas J. Petersen
Page 1

May 28, 2024

Douglas J. Petersen
148 Long Bay Drive
Laconia, NH 03246

      Re:    Claim for Benefits under Split Dollar Agreement

Dear Mr. Petersen:

I write to you on behalf of the Workers Federal Credit Union ("WCU") Board of Directors (the "Board"), which is the Administrator of the Split Dollar Agreement dated as of December 1, 2021 (the "SERP").

### Denial of Your Claim for Benefits

On December 4, 2023, the WCU Board first became aware of your request, made to Arthur J. Gallagher & Co., to borrow against the SERP. Your request constitutes a claim for benefits. On February 29, 2024, the WCU Board, through then-Board Chair Mary Heafy, advised you of special circumstances which required the WCU Board to extend its consideration of your request for benefits through June 2, 2024. The Board has reviewed your claim and hereby denies your claim for benefits.

### Basis of Denial

The specific reasons for the denial of your claim for benefit, with a reference to the specific provisions of the SERP on which the denial is based, are as follows:

1. WCU's accounting of its allowance for loan and lease losses ("ALLL") was understated by at least $5.5 million as of December 31, 2022, and $1.2 million as of December 31, 2021, which resulted in WCU exceeding the minimum targeted return on assets ("ROA") threshold needed for payments of performance bonuses to both yourself and Mr. Smith for 2022 and 2021. The inadequate funding of the ALLL in both 2021 and 2022 is a violation of NCUA regulation §702.113(d) "Charges for loan and lease losses."

NCUA Regulation § 702.113(d)[1] includes rules for charges for loan and lease losses, including the following: (i) "Charges for loan and lease losses shall be made timely and in conformity with GAAP; (ii) the ALLL must be maintained in accordance with GAAP; and, (iii) at a minimum, adjustments to the ALLL shall be made prior to the distribution or posting of any dividend to the accounts of the members."

As of December 31, 2022, WCU's ALLL was understated by at least approximately $5.5 million. In all year-ends from December 31, 2020, 2021, and 2022, WCU's ALLL as a percentage of loans and leases was significantly lower than it should have been. WCU's ALLL as a percentage of loans was 0.40%, 0.44%, and 0.31% as of December 31, 2020, 2021, and 2022, respectively, which was significantly below what it should have been for these time periods. WCU's delinquent loans as a percentage of total loans was 0.97%, 0.84%, and 1.39% as of December 31, 2020, 2021, and 2022, respectively.

As of December 31, 2022, the WCU ALLL calculation, which was prepared under your supervision and oversight, decreased WCU's ALLL by $1.7 million from $6.9 million as of September 30, 2022, to $5.2 million as of December 31, 2022. The $1.7 million decrease in the ALLL was contrary to information available at the time regarding WCU's loan charge-offs and delinquencies, which at the time were both trending significantly higher.

WCU's loan charge-offs were $1,858,387 in the fourth quarter of 2022 compared to WCU's

---

[1] Title 12, Chapter VII – National Credit Union Administration, Subchapter A – Regulations Affecting Credit Unions, and Part 741.



119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618



Douglas J. Petersen
Page 2

quarterly average of $993,862 in the three previous quarters, or an increase of 87%. WCU's recoveries on previous charge-offs were $233,539 in the fourth quarter of 2022 compared to WCU's quarterly average of $385,833 in the previous three quarters, or a decrease in recoveries of 39.5%. The upward trend of loan charge-offs continued in 2023 and 2024. Quarterly charge-offs averaged $2,004,386 per quarter for 2023 and for the first quarter of 2024 were $2,568,264.

WCU's ALLL documentation explaining the decrease in ALLL as of December 31, 2022, consisted of a third-party economic report included as an attachment to the ALLL package computations as of December 31, 2022. This economic report indicated macro improvements in the economy as a reasoning for lowering WCU's ALLL as of December 31, 2022. However, the lowering of WCU's ALLL was not supported by the actual declining quality of WCU's loan portfolio as of December 31, 2022.  This third-party economic report was relied on by you and WCU's chief financial officer, over whom you had supervision and control.

The declining quality of WCU's loan portfolio was poor because of WCU's significant increase in its consumer recreation vehicle ("RV") loans from 2020 through 2022. Further, WCU's consumer RV loan delinquencies increased from $1.9 million in June 2022, to $5.3 million in December 2022. The NCUA does not track consumer RV loans as a separate category for credit unions. WCU's consumer RV loans had increased to more than $300 million as of December 31, 2022.

WCU increased its loan portfolio from $1.3 billion as of December 31, 2020, to $1.7 billion as of December 31, 2022. This large growth in WCU's loan portfolio was largely attributable to the growth in WCU's consumer RV loans. WCU's indirect lending program, which consisted primarily of RV loans, was criticized by the NCUA Examiners in their September 2021 Examination (and prior examinations). WCU's loan policy inadequacies, weaknesses, and indirect lending criteria criticisms by the NCUA included the following: (i) No use of debt-to-income limits or consideration in the underwriting process; (ii)  No formal monitoring of policy exceptions for mileage or other exception criteria; and, (iii)  Allowance of financing vehicles for terms well beyond their useful age.

In addition to the lack of adequate loan policies related to the indirect RV lending program, the NCUA Examiners found that WCU combined their direct and indirect lending loans for financial performance as a consumer loan pool in WCU's Enterprise Risk Management ("ERM") Committee reports. There were no management reports that identified the performance of separate indirect loan programs for auto, recreational, and boat. Without proper monitoring tools in place, WCU was not able to identify if the indirect lending programs were adding additional risk, until write-offs were happening. The lack of these specific policies, which should have been implemented and followed under your leadership and supervision, was in contravention of NCUA regulation §701.21 "Loans to members and lines of credits to members," subsection (c)(2) "Written policies."

The loan policy inadequacies and weaknesses in lending criteria associated with the indirect lending program, identified by the NCUA Examiners, increased WCU's credit risk and potential losses.

WCU's ALLL calculations for September 30, 2021, and December 31, 2021, were criticized by NCUA Examiners in their September 2021 Examination for undocumented changes to methodology (WCU changed to a five-year historical loss factor from a two-year historical loss factor). The changes made by WCU resulted in more favorable historical loss factors for both commercial loan losses and Consumer E loans and reduced WCU's ALLL by diluting recent charge-offs that were deemed not representative. The NCUA Examiners did not find the explanations supporting WCU's change in methodology regarding the historical loss factor. Additionally, WCU's changes were not reflected in its loan loss policies.

WCU's undocumented changes to the loan loss policies and their application resulted in the December 31, 2021, ALLL being understated by at least $1.2 million. The inadequate funding of the ALLL in 2021 is a violation of NCUA Regulation §702.113(d) "Charges for loan and lease losses."

In addition to the NCUA noted deficiencies identified above, the NCUA found that the



119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618



Douglas J. Petersen
Page 3

underlying evaluation of criticized commercial loans rated 6 or worse had significantly increased from $3.744 million as of September 30, 2020, to $56.939 million as of November 30, 2021. Additionally, the NCUA found that individual quarterly criticized asset reports were not completed for large dollar loans with risk ratings of substandard or worse.

In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

2. <u>Under your leadership as CEO of WCU, WCU's investment transactions in 2020, 2021, and 2022 were not in compliance with WCU's policies and procedures and NCUA regulations. WCU was significantly overcharged by their broker, Performance Trust, for brokerage fees, commissions, and expenses. WCU was overcharged by approximately $1.5 million for the period from January 1, 2020, through June 8, 2023. Furthermore, WCU did not obtain competitive bids from other brokers and/or confirm the broker's pricing was appropriate. The investments recommendations made by Performance Trust resulted in significant issues with WCU's liquidity and interest rate risks. You, as CEO, were directly and ultimately responsible for WCU's investment portfolio, including supervising the investment department personnel.</u>

WCU's CFO, Tim Smith, appears to have had a close relationship with Jens Shroyer ("Mr. Shroyer"), broker with Performance Trust. There were numerous events, conferences, dinners, and golf outings shared between the two of them. Mr. Smith received tickets for sporting events including Patriots games and golf outings including professional golf events from Mr. Shroyer/Performance Trust. Mr. Shroyer frequently made investment recommendations for WCU to Mr. Smith and his team/subordinates. These actions violated WCU's Code of Conduct and potentially various bank bribery laws. You either directly or indirectly approved of these actions and you permitted this improper relationship to continue under your supervision of the CFO and investment department personnel.

WCU's investment transactions in 2020, 2021, and 2022 were not in compliance with WCU's policies and procedures and NCUA regulations. Specifically, from January 1, 2020, through December 31, 2022:

- WCU was significantly overcharged by Performance Trust for brokerage fees, commissions, and expenses, for its investment purchases.

- WCU paid an annual average of approximately $1.35 million in securities transactions mark-ups per year for the period from January 1, 2020, through June 8, 2023.

- WCU was not obtaining the required competitive bids for its investment transactions and was almost exclusively utilizing Performance Trust as its broker for purchasing investments although there were multiple other approved brokers that WCU employees could have utilized. The NCUA states in Regulation §703.11 that a Federal Credit Union must obtain either price quotations on the security from at least two broker dealers or a price quotation on the security from an industry-recognized information provider.

- WCU did not actually verify that the pricing it was receiving from its investment broker, Performance Trust, was competitive with the terms offered by other approved WCU brokers. Another approved broker of WCU expressly warned Mr. Smith that NCUA Regulations Rule 703.11 requires credit unions to obtain price quotations from at least two broker dealers before purchases. Under your leadership and supervision, WCU did not change its practices.

- WCU purchased a significant dollar amount of municipal securities which were lightly traded, had long maturities, and did not offer significant interest rate yield over safer and more liquid investment alternatives. This investment selection was not suitable for WCU and was the outcome of WCU's overly friendly relationship with Performance





119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618

Douglas J. Petersen
Page 4

Trust, as well as the failure to obtain the required competitive bids. This all occurred under your leadership and supervision.

You apparently attended WCU's investment committee meetings. The length of these investment committee meetings was typically around 10 to 15 minutes in 2019 and 2020. There is no record of investment committee meetings at all for approximately 1.5 years in 2021 through the first half of 2022. You also generally attended WCU's Asset Liability Management ("ALM") committee meetings. Mr. Shroyer of Performance Trust also attended two or three of these meetings.

WCU experienced a significant increase in gross unrealized losses for debt securities available for sale of ($8.7 million) as of December 31, 2021, and ($114.0 million) as of December 31, 2022. A key factor in WCU's gross unrealized losses was that WCU had significant investments in municipal bonds and private-label mortgage-backed securities.

The NCUA publishes its Examiner's Guide, which includes comprehensive instructions on determining adequacy of credit union's investment policy, procedures, and internal controls and evaluate suitability of the investment portfolio in relation to the credit union's business plan, asset-liability management ("ALM") strategies, liquidity, and net worth position.[2]

- "The board should use established, well-capitalized, and reputable national and regional firms, and should establish minimum capital standards for each broker-dealer. If available, the credit union should consider reports and credit ratings from one or more of the nationally recognized statistical rating organizations (e.g., Moody's, Standard & Poor's, or Fitch.)."[3]

- "Management should perform a background and reputation check on broker-dealers with whom the credit union does business (see Letter to Credit Unions, No. 157, dated September 1994.)."[4]

- "On a continuing basis, management should analyze the overall performance of the broker (e.g., review the number of times the broker provided the lowest cost offer on securities purchased.)"[5]

- "Credit unions should obtain competitive bids and offers from more than one broker. Before purchasing or selling a security, management must procure either (1) price quotations on the security from at least two broker-dealers or (2) a price quotation on the security from an industry-recognized information provider (e.g., Bloomberg, Reuters, etc.). This information is not required for new issues either purchased at par or at an original issue discount (e.g. a U.S. Treasury Note purchased at a discount at auction). To ensure the credit union receives a fair market price, management should consider obtaining three independent quotations before purchasing or selling the security."[6]

- "If management cannot procure multiple offers from different brokers to sell a security to the credit union, they should determine the liquidity of the investment (e.g., will other brokers provide a bid on the security) and whether the offer represents fair value before committing to purchase it. The lack of multiple bids from brokers to purchase a security from a credit union may indicate an illiquid security (e.g., often, only the originating dealer bids on a privately placed collateralized mortgage obligation ('CMO')). The credit union should try to confirm that the sole bid represents fair value. For example, the credit union may request bids on comparable securities (those with substantially similar characteristics), retaining reasonable and appropriate documentation (e.g., dated telephone note with quote from broker or dated Wall Street

---

[2] NCUA Examiner's Guide, "Foreword," iii.
[3] NCUA Examiner's Guide, Chapter 12 – "Investment Analysis," 12-11.
[4] NCUA Examiner's Guide, Chapter 12 – "Investment Analysis," 12-12.
[5] NCUA Examiner's Guide, Chapter 12 – "Investment Analysis," 12-12.
[6] NCUA Examiner's Guide, Chapter 12 – "Investment Analysis," 12-12, 12-13.





119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618

Douglas J. Petersen
Page 5

Journal quote on specific comparable security.) Brokers generally do not provide written bids."[7]

- "The board must maintain an internal list of board-approved broker-dealers, including a list of limitations on the amount of funds and types of securities that management or staff may place or invest with each firm. In addition, the board should possess a written agreement with each broker-dealer that specifies the type of securities, transactions approved, and the approved amount for each firm and individual broker. The board should acquire and maintain a basic understanding of the business structure of the broker-dealer including the primary emphasis of the firm (e.g., government securities, agency securities, CMOs, retail, etc.)."[8]

You failed to properly manage and supervise WCU's investments department. This department lacked significant experience and had significant issues with its personnel. Both Mr. Farricy and Mr. Sargent were documented for serious performance issues including failing to show up to work and failing to complete assigned tasks and responsibilities at WCU. Furthermore, WCU's investment-related documentation was not always completed in a timely manner and at times misrepresented dates when approvals were actually made. WCU improperly had Performance Trust performing dual roles of asset-liability management consultant and investment broker.

WCU's poor interest rate risk management and liquidity crisis were a direct result of the incompetent management of WCU's investments, which you oversaw and supervised. The WCU employees with investment-related responsibilities and roles lacked significant experience with investments, were not well qualified to handle a credit union's investment portfolio or had multiple documented performance issues. Moreover, WCU's internal documentation for investment transactions was not consistently being completed in a timely manner, and on many occasions necessary signatures were missing from WCU's internal trade notice form or completed after the trade date.

In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

3.  <u>You erased your WCU-issued laptop hard drives, which contained critical and sensitive material and documents, in violation of WCU's Information Technology Policy, the Physical Security Policy and Code of Conduct. You also shredded physical documents.</u>

After the announcement of termination of your employment at WCU, you erased virtually all of the files stored on your laptop computer's respective hard drive, including at least 29,000 files, which have now been recovered. The documents recovered include sensitive and proprietary documents that should not have been erased. Your erasing of these hard drives and destruction of physical documents violated various WCU policies, the Code of Conduct and NCUA rules, regulations and guidance.

WCU's Information Security Risk Management Policy & Program states that "This policy and program covers information that is in possession of the Credit Union, including contractors, affiliates and agents, which may be stored or shared by any means. This includes electronic information, information on paper, and information shared orally or visually (e.g., telephone and video conferencing). Also included is any information in storage or in electronic or physical transmission outside of Workers' facilities (e.g., service providers). Additionally, it includes all individuals, including directors, employees, partners, and contractors, with access to the Credit Union's corporate, member, or other confidential information."[9]

WCU's Information Security Risk Management Policy & Program under its section titled, "Backup and Contingency Planning," states that "The data stored on Workers end users' computer systems will be backed up daily to ensure the integrity and availability of Workers end

---

[7] NCUA <u>Examiner's Guide</u>, Chapter 12 – "Investment Analysis," 12-13.
[8] NCUA <u>Examiner's Guide</u>, Chapter 12 – "Investment Analysis," 12-13.
[9] WCU's Information Security Risk Management Policy & Program, September 7, 2021, 3 of 14.





Douglas J. Petersen
Page 6

user data and information assets. This data will be backed per the IT Policy – Backup and Validation Policy and stored offsite. Ensure that server backups shall occur depending on the server role and function as defined in the Workers Credit Union Backup Plan. Backups will be replicated and encrypted to the Workers secondary datacenter to ensure integrity and availability of data in case of a disaster or emergency. Backup monitoring shall entail daily email status alerts to the IT Department. A monthly backup validation will occur to ensure the validity of the backups per the Workers Credit Union Backup Plan."[10]

WCU's Information Technology Policy under its section titled, "Backup & Data Protection," states that "Company data and records are a crucial business asset of Workers Credit Union. All reasonable efforts must be taken to ensure compliance with legal and regulatory requirements, and to safeguard the integrity and confidentiality of company data. For more please refer to published IT Policy - Backup and Validation."[11]

WCU's Information Technology Policy under its section titled, "Computer Systems," states that "The standard setup for network attached desktop computers is that each user's files are saved to the network. All computers receive the S (Shared), P (Public) and I (Individual) drive mappings at logon… When a file is saved (via desktop, laptop, or tablet) to these folders, documents are automatically backed up on a daily basis. In the event of a PC malfunctions, files can be restored from the network… When saving files, employees should check file paths to ensure that they are saving to the correct directories on the network… <u>All files should be stored on a network drive as described above</u>."[12]

WCU's Code of Conduct under Section II – "Confidential Information" states "All employees must comply with the Credit Union's IT Policy, Information Security Policy, Physical Security Policy, and the Privacy Policy."[13] You most recently viewed and acknowledged WCU's Code of Conduct on June 2, 2022.[14]

WCU's Physical Security Policy further provides that WCU documents should not be removed and should be consistently maintained in a record preservation program, and in a manner consistent with NCUA, Part 749.

The NCUA publishes its <u>Examiner's Guide</u>, which includes comprehensive instructions on a risk-focused program with primary goal of ensuring the overall safety and soundness of the credit union system. The <u>Examiner's Guide</u> states that NCUA examination objectives include evaluating management's ability to recognize, assess, monitor, and control information systems and technology ("IST") related risks.[15] The <u>Examiner's Guide</u> states that "Credit unions must regularly and routinely back up computer data."[16] It also states as to "Frequency" as follows: "credit unions should back up (1) data files at least daily; (2) application files both when they make changes and routinely, usually monthly or quarterly; (3) a current copy of the operating system, and (4) vital records every three months."

You disregarded these important document retention principles in violation of the foregoing clear and critical guidelines.  In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

4. <u>WCU's unreconciled items for mis-posted transactions has resulted in approximately $900,000 in net loss exposure and potential member relationship issues.</u> WCU implemented a new core banking system conversion in October 2022, which resulted in significant ongoing processing issues related to mis-posted transactions. The accounting department, under your direct oversight and weekly involvement, was unable to stay on top of the mis-posted transactions due to interface issues between systems.

---

[10] WCU's Information Security Risk Management Policy & Program, September 7, 2021, 12 of 14.
[11] WCU's Information Technology Policy, March 28, 2022, 11 of 18.
[12] WCU's Information Technology Policy, March 28, 2022, 11-12 of 18.
[13] WCU's Code of Conduct, ERM Approval Date: May 17, 2022, 3 of 10.
[14] WCU's Microsoft Excel file, "D. Petersen Policy Acknowledgement.csv."
[15] NCUA <u>Examiner's Guide</u>, Chapter 6 – "Information Systems and Technology," 6-1.
[16] NCUA <u>Examiner's Guide</u>, Chapter 6 – "Information Systems and Technology," 6-8, 6-9.




Douglas J. Petersen
Page 7

You presided over, implemented, and managed a system conversion in October 2022. Under your leadership and supervision, WCU personnel in operations and accounting did not adequately follow-up and resolve daily posting differences in a number of clearing accounts. WCU's accounting personnel had little knowledge of these reconciling items and WCU's operations personnel claim insufficient time to resolve these issues:

- As a result, there is a current net loss exposure related to these unresolved reconciling items of approximately $900,000.

- There was a failure of the accounting department headed by you, as CEO, to provide sufficient resources to Ms. Perlupo, the Controller, as well as the deposit operations department, to develop appropriate reconciling processes and procedures to resolve WCU's unreconciled items in a timely manner. You failed to acknowledge the seriousness of the reconciliation issues facing WCU and their impact on the general ledger accuracy, nor did you plan for or implement additional resources to address the clear problems. Moreover, you received direct communications from personnel of WCU that the account records were not accurate due to system conversion issues, yet you failed to act on those concerns.

In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

5. <u>Mr. Smith was not transparent during his presentation to the Board on the use of derivatives to manage interest rate risk at the January 10, 2023 Board Meeting. WCU was not eligible to use derivatives to manage interest rate risk because in order to be eligible, WCU would have had to apply to and obtain approval from the NCUA to do so - in light of WCU's management component in the CAMEL rating assigned by NCUA, which was a 3 rating. You and Mr. Smith gave the Board the misimpression that WCU was in fact eligible to use derivatives, with knowledge of the NCUA restriction, by indicating that WCU had somehow received a "verbal" approval from an unidentified regulator.</u>

You participated in Board meetings throughout your tenure as CEO of WCU. As such, you witnessed, but did not correct, the CFO, Mr. Smith, as he made misrepresentations to the Board.

Mr. Smith was not transparent during his presentation to the Board on the use of derivatives to manage interest rate risk on January 10, 2023. WCU was required to apply to the NCUA for eligibility to use derivatives to manage interest rate risk due to its management rating (CAMEL rating). Mr. Smith was aware of this restriction in December 2022, as evidenced by email communications, but did not communicate this restriction to the Board during the January 2023 Board presentation. You did not correct or even address Mr. Smith's misstatements, despite your position as CEO and despite your duties of supervision and of candor to the Board.

The NCUA definition of derivatives is a "financial contract which derives its value from the value and performance of some other underlying financial instrument or variable, such as an index or interest rate."[17] The NCUA amended its derivatives rule in May 2021.[18]

Subpart B of NCUA Regulation §703.108 explains a federal credit union's authority to use derivatives to manage interest rate risk. The NCUA defines interest rate risk as "refers to the current and prospective risk to a credit union's capital and earnings arising from movements in interest rates."[19]

- NCUA Regulation §703.108 Notification and Application Requirements, provides as follows:

---

[17] NCUA Derivatives Rule Application Requirements | NAFCU
[18] NCUA Derivatives Rule Application Requirements | NAFCU
[19] NCUA Derivatives Rule Application Requirements | NAFCU





Douglas J. Petersen
Page 8

> a. Notification. A Federal credit union that meets the following requirements must notify the applicable Regional Director in writing or via electronic mail within five business days after into its first Derivatives transaction: (1) The Federal credit union's most recent NCUA Management CAMEL component is a rating of 1 or 2; and, (2) The Federal Credit Union has assets of at least $500 million as of its most recent call report.
>
> b. Application. A Federal credit union that does not meet the requirements of paragraphs (a)(1) and/or (2) of this section must obtain approval before engaging in Derivatives under this subpart from its applicable Regional Director, by submitting an application that, at a minimum, includes [additional information]"[20]

WCU's management component of CAMEL rating assigned by the NCUA was 3 as of September 30, 2021, and 4 as of December 31, 2022. You and Mr. Smith were aware of the CAMEL rating at the time of the Board presentation, yet you did not correct or even address Mr. Smith's failure to advise the Board of the restrictions related to the use of derivatives to manage risk.

In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

6. <u>Under your leadership, WCU had significant negative findings from its NCUA Examinations. WCU had significant problems with its management, capital adequacy, investments, credit risk, liquidity risk, interest rate risk, compliance risk, strategic risk, transaction risk, and reputation risk. You did not meet NCUA corrective action deadlines, nor did you effectively implement correct action.</u>

The NCUA issued the following Reports of Examinations of WCU: (a) a report dated as of September 30, 2019, which examination results were discussed between representatives of the MA Division, NCUA, and WCU on January 21, 2020; (b) a report dated as of September 30, 2020; (c) a report dated as of September 30, 2021; (d) a report dated as of September 30, 2022; a report dated as of December 31, 2022.

You were the CEO and in charge of communicating with the regulators and authorities, considering the recommendations given and implementing corrective action. These things did not occur. These reports show a repetitive failure to address perceived deficiencies, and general disregard of the NCUA Examinations.

NCUA rates credit unions under various categories, including capital adequacy, asset quality, management, earnings and liquidity/ALM. ("CAMEL"). WCU's historical CAMEL rating worsened significantly under your leadership and tenure. Under your leadership and tenure, the NCUA expressed criticism in all categories of the CAMEL evaluation process. Notably, these NCUA Examination Reports, attached hereto as Exhibit A, identify the NCUA Regulations that applied to their examinations, the transgressions, and the violations of these NCUA Regulations.

Many of the other issues identified as constituting an independent basis for finding cause for the denial of your requests for benefits were identified, documented and discussed by the NCUA. As such, you were on notice of these problems and issues, yet took insufficient and in some cases no corrective action.

In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

---

[20] NCUA Derivatives Rule Application Requirements | NAFCU



119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618



Douglas J. Petersen
Page 9

7. <u>WCU's annual scorecard system for paying performance bonuses to you were not properly designed. The NCUA requested through an exam report an independent analysis, to be reported directly to the Board.  You oversaw this analysis and revised the independent consultant's work product before presenting to the Board.</u>

The NCUA indicated in its Report of Examination – DOR Issue with an effective date as of September 30, 2021, that "Currently, the senior management team, including the CEO and CFO, have their bonuses tied to loan growth and quality, investment quality, and CAMEL rating. Senior management employees are prohibited from benefiting directly or indirectly from any loan made by the CU. Also, while not specifically prohibited, it is not a safe and sound business practice to have your CFO's bonus structure be tied to the quality of investments he is purchasing especially when he is not tracking or reporting the quality of the investments to the board of directors." The NCUA stated WCU make the following changes to senior management bonuses:

- "Create a policy and procedures governing the senior management team bonus process and approval."

- "Remove loan growth and loan quality bonuses from all senior management team bonuses."

- "Reevaluate the soundness of having the CFO's bonus tied to investment yield and risk taking."

- "Amend the bonus plan for all senior management employees to comply with NCUA Regulations."

- "Furthermore, it is not a good internal control too have the credit union's CAMEL rating or result of the financial statement audit tied to the bonus plan/structure for senior management."

- "The review of a CEO's performance is usually completed in executive session during board meetings, which is what was observed. However, the executive session minutes did not give any detail on what was discussed, what the board reviewed, the finished product, and any supporting workpapers to the decision."

You disregarded the recommendations of the NCUA.  In particular, the NCUA advised WCU to have an independent analysis conducted of the overall performance bonus system.  Rather than commissioning an independent analysis, you oversaw, edited, and revised an independent consultant's work product in connection with this NCUA recommendation before presenting it to the Board.

In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

8. <u>Under your supervision, Mr. Smith improperly certified WCU to receive tax credits from the Internal Revenue Service ("IRS") in the amount of approximately $6.8 million without you or Mr. Smith advising the Board that you and Mr. Smith had not evaluated or properly analyzed that WCU was eligible to receive the tax credits.</u>

Employee Retention Tax Credits ("ERC") were provided for in the Coronavirus Act Relief and Economic Stimulus Act (the "CARES Act") and any other COVID-19-related legislation which be available to WCU for the period from the first quarter 2020 through third quarter 2021, which were reversed by WCU's new auditor, Moss Adams, LLP ("Moss Adams"), effective date to 2023.  Under your supervision, WCU engaged Synergi effective as of August 18, 2021, to identify and determine WCU's eligibility for any ERC from the Internal Revenue Service ("IRS"). While WCU applied for approximately $6.8 million, the actual amount received by WCU for ERC was $7,072,388 from August 2022 to August 2023, based on the IRS calculation





DocuSign Envelope ID: 24E043A8-AD88-4A7B-B790-AA93EF62CB5E

Douglas J. Petersen
Page 10

and interest paid by the IRS.

According to the NCUA Exam of WCU as of December 31, 2022, "Workers certified to the IRS that you are eligible for the ERC due to meeting the following provision:

> '*WCU is eligible for the CARES Act ERC under the Government Orders Test because the Company has experienced a full or partial suspension of its business operations due to government orders issued in response to the COVID-19 pandemic.*'"

The analysis goes on to reference the following governmental orders as support in the NCUA Exam as of December 31, 2022:

- "*Capacity Limitations: State of Massachusetts Orders limited capacity from March 2020 to June 2021. Branches and lobbies were closed in March and then sporadically opened through Q3 2021.*"

- "Work from Home Transition Delay and/or Inability to Perform Work Tasks Remotely: Call Center was effectively closed in March 2020 and 90% of staff was forced to work from home. The volume of calls increased dramatically due to lobby closures. Service was severely impacted, and the Company incurred unexpected significant cost to set up employees on a remote basis."

- "COVID-19 Exposure, Quarantine, Extended Leave, Sick time, and Absenteeism: Many employees were exposed to COVID since the pandemic started, requiring quarantine and contact tracing. Division and/or Department Closures: Key executives were split to avoid exposure."

- "Inability to Access Customers: Capacity restrictions, closures, and social distancing guidelines limited the Company's ability to meet with clients."

- "Travel and Meeting Restrictions: Essentially all travel and face to face industry meetings were cancelled from March 2020 through Q4 2021."

- "Social distancing"

- "Adding Cleaning and PPE Expense"

According to the NCUA Exam of WCU as of December 31, 2022, the NCUA stated, "Since Workers FCU was exempt from government shutdowns as an essential business, it is unclear how these referenced disruptions qualify for the institution for the ERC under government ordered shutdown. As this is an IRS issue, we recommended that you obtain an independent validation that you do qualify for the credit under the gross receipts provisions of the ERC program from a qualified professional who does not have a financial interest in NFFCU obtaining the credit."

According to its Executive Summary, Moss Adams prepared a memorandum of its review of WCU's ERC tax credit documentation dated as of April 11, 2024. Moss Adams advised that WCU may participate in the Voluntary Disclosure Program for taxpayers who received ERC refunds but may not be eligible. Moss Adams further recommended an independent analysis to determine whether WCU is eligible for the payments already made to WCU.

As matters stand, under your tenure and supervision, WCU received over $7 million that is at the very least in jeopardy because WCU did not conclusively determine that it was eligible to receive the tax credits. On top of the more than $7 million issue, WCU has incurred significant expenses with professional service providers in an effort to rectify this significant issue.

In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).



119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618



DocuSign Envelope ID: 24E043A8-AB88-4A7B-B79C-AA93EF62CBBF

Douglas J. Petersen
Page 11

9. <u>WCU's Loan Policy was not followed as it pertains to underwriting requirements for a November 2018 commercial loan in the amount of $11.5 million and when WCU took a Quitclaim Deed in lieu of foreclosure in May 2020 for three commercial properties located at 167 – 171 – 175 Dwight Road in Longmeadow, Massachusetts, related to a delinquent WCU commercial loan. This property was ultimately sold by WCU in 2023 for $5.1 million with cash proceeds to WCU of approximately $4.6 million resulting in a significant total loss of more than $6 million.</u>

Under your leadership and supervision, WCU entered into a refinance business-purpose single advance commercial loan agreement and promissory note (loan number 701736657) dated November 1, 2018, with borrower Longmeadow Park LLC ("Longmeadow Park") in the amount of $11,500,000 with a variable interest at an initial rate of 5.4% and a maturity date of November 1, 2028 (the "Longmeadow Loan"). The Longmeadow Loan commercial loan agreement and promissory note documents were signed on November 1, 2018, by borrower Louis Masaschi ("Mr. Masachi"), Manager/Member of Longmeadow Park and by lender, Mr. Turcotte, Vice President of WCU. The security for the Longmeadow Loan by Longmeadow Park included leases and rents assignment of 167 – 171 – 175 Dwight Road and a priority mortgage lien on the commercial property located at 167 – 171 -175 Dwight Road, Longmeadow, MA 01106. The guarantors of the Longmeadow Loan were individuals Louis Masaschi and Jeanette Norman ("Ms. Norman"), husband and wife.

The Loan Request's "Background and Request Summary" section contained the following information: "Lou Masaschi and his wife, Jeanette Norman were introduced to Workers by Bob Bender of RMB Solutions as part of the Shaker Road foreclosure in May of 2018. Workers ultimately transferred the ownership of Shaker Road to Mr. Masaschi and Ms. Norman, and financed the transaction. Since that time, Workers has been in discussions with Mr. Masaschi regarding other opportunities. The following request is a result of those discussions."

Prior to the Longmeadow Loan and the Shaker Road Loan, a "Fee Structure for Services" agreement with an effective date as of July 13, 2017, was entered into by and between RMB Finance Solutions, LLC ("RMB") and WCU. The "Fee Structure for Services" agreement was signed by WCU Senior Vice President William Mullin ("Mr. Mullin") and Robert Bender ("Mr. Bender"), Partner – RMB.

You attended the WCU Business Loan Committee meeting on September 12, 2018, and approved the Longmeadow Loan.

The Longmeadow Loan went into default. WCU, under your supervision and management, engaged Mr. Bender of RMB to act as a workout consultant. Mr. Bender then coordinated a deed in lieu of foreclosure transaction and proceeded to act and be paid as a property manager. You attended the Business Loan Committee meetings in which the Longmeadow Loan was discussed and these issues, including Mr. Bender's work – which posed a clear conflict of interest – were discussed.

A United States Department of Justice press release dated May 25, 2023, disclosed that Mr. Masaschi and Ms. Norman had been arrested and indicted in connection with a scheme to defraud commercial lenders by providing false and fraudulent rent rolls and forged lease agreements for properties.

WCU ultimately sold the property at 167, 171 & 175 Dwight Road in Longmeadow, Massachusetts, on November 17, 2023, for a sales price of $5,100,000, resulting in a total loss of more than $6 million.

Not only as CEO, but in your role of expressly approving the Longmeadow Loan, you violated the following WCU Loan Policy sections as it relates to WCU's handling of this Longmeadow Loan: (a) Section 4.03, dealing with underwriting process, because you and the WCU Business Loan Committee did not review all leases, failed to obtain all tax returns, insufficiently evaluated personal credit history and failed to obtain property inspection reports; (b)   Section 8 – Problem Loan Management Procedures; (c) Section 8.07 Collections, Workout Arrangements, Renewals and Extension; (d) Section 8.08 Foreclosure and Litigation; and,  (e) Section 8.10 Other Real Estate Owned.



119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618



Douglas J. Petersen
Page 12

Moreover, the NCUA <u>Examiner's Guide</u> states the following regarding "Underwriting Standards:"[21]

- "The level and depth of credit analysis and risk assessment should be commensurate with the overall risk the borrowing relationship poses to a credit union based on its size, risk and complexity. A credit union's commercial loan policy must address the required analysis and depth of the financial review performed to support a credit decision. It should establish the approval process, including the lending authorities and the documentation of the credit decision. It should also outline the required components of a credit approval document."

- "The approval process and documentation should provide sufficient information to allow the approving body to make a fully informed credit decision. A commercial loan policy should also set the requirements for the financial reporting to support a credit decision. It should address the minimum criteria for historic reporting at the inception of the loan, as well as regular reporting after the loan is closed, and the required quality of financial information to establish an accurate and reliable assessment of financial trends. Risks should be monitored throughout the life of a loan based on periodic review of the financial position of the borrower and site visits to detect any operational changes."

- "A credit union's borrower analysis should focus on the borrower's financial condition and ability to repay. The analysis should include income and expense trends, debt service ability, balance sheet changes, and the impact of those changes on the borrower's ability to service debt. The analysis should discuss the required evaluation of related parties and the influence those parties have on a borrower's ability to repay a loan."

- "The policy must establish due diligence requirements to evaluate the other sources of income or losses that affect the guarantors or principals to determine the global financial condition and the debt service ability of a borrower and any associated borrowers."

- "The policy should establish requirements for financial projections, which will ensure a borrower is actually planning and managing operations to achieve future goals. Financial statement projections should be required when a borrower's historic performance does not support the proposed debt repayment, or when a credit union anticipates structural change in the borrower's future operations, and repayment depends on the success of the changes. A borrower or principal must prepare such a projection, because they are responsible for executing and achieving the projected plan."

- "A credit union's underwriting standards must address the quality of the financial information used to make a credit decision and ensure that the degree of verification reflected in the financial information is sufficient to support the financial analysis and the risk assessment of a credit decision. A credit union can determine the quality of a financial statement using the level of assurance provided by a preparer and the required professional standards supporting the preparer's opinion."

- "In many cases, borrower-signed tax returns or financial statements professionally prepared in accordance with GAAP are sufficient for less complex borrowing relationships, such as those that are limited to a single operation of the borrower and principal with relatively low debt. For more complex and larger borrowing relationships, such as those involving borrowers or principals with significant loans outstanding or multiple or interrelated operations, a credit union should require borrowers and principals to provide either:

---

[21] [Commercial Loan Policy (ncua.gov)](Commercial Loan Policy (ncua.gov))





Douglas J. Petersen
Page 13

> 1. An auditor's review of the financial statements prepared consistent with GAAP to obtain limited assurance (a 'review quality' financial statement), or
>
> 2. An independent financial statement audit under GAAS for the expression of an opinion on the financial statements prepared in accordance with GAAP (an "audit quality" financial statement)."

- "A credit union's underwriting standards must also include the type of collateral allowed, LTV ratio limits, personal guarantees of the principals, and methods for valuing all types of authorized collateral. For real estate valuation, the valuation methods must comply with part 722, Appraisals of NCUA's regulations. The standards should set minimum collateral requirements based on the characteristics of the collateral and risk associated with the borrowing relationships. The standards should also set forth the requirements for establishing an enforceable and perfected lien position for different types of collateral."

- "A credit union's commercial loan policy may allow for exceptions to the policy, when necessary, to meet the unique circumstances of a borrowing relationship and when doing so would not create undue risk to the credit union. The policy must establish the process for approval and documentation of an exception to loan policy. All exceptions to the loan policy should be tracked and periodically reported to senior management and to the board."

WCU's handling of the Longmeadow Loan was woefully deficient in every regard. You not only supervised and managed WCU during this time period, but actually approved this loan, the subsequent work-out, the conflicted retention of Mr. Bender of RMB. The final sale of the collateral property resulted in a more than $6 million loss. In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

10. <u>You violated WCU's Accounts Payable & Expense Policy through your use of WCU-issued credit card and cash reimbursements paid by WCU.</u>

You received benefits from the use of your WCU-issued credit card and cash reimbursements paid by WCU. You violated WCU's Accounts Payable & Expense Policy because you did not properly disclose the purpose (the reason for the expense) in most of your expense reimbursement submitted into WCU's Concur system. These credit card transactions totaled approximately $160,000 for the period from January 6, 2016, through July 27, 2023.

You were provided access to one WCU credit card, which was referred to as "Elan VISA Corporate Card IBCP – US." The total charges on your WCU credit card were $160,888 for the period involving transactions between January 6, 2016, through August 14, 2022, and $24,481 for the period involving transactions between August 30, 2022, through July 27, 2023. The total cash reimbursement payments to you were only $22,232 for the period involving transactions that were submitted between January 6, 2016, through August 14, 2022. Thus, you apparently used your WCU credit card for expense reimbursements. The total cash reimbursements received by Mr. Petersen were $700 for the period involving transactions between August 30, 2022, through June 30, 2023.

**WORKERS**
CREDIT UNION

119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618



Douglas J. Petersen
Page 14

Below is a table demonstrating WCU's expense categories for your credit card charges and cash reimbursements:

| WCU Expense Categories for Mr. Petersen's WCU's Credit Card Charges and Cash Reimbursements from January 6, 2016, through August 14, 2022 | | |
|---|---|---|
| Airfare – $52,451 | Executive Miscellaneous. Office – $113 | Parking – $3,577 |
| Automobiles – $60 | Fuel –$14,235 | Postage – $5 |
| Business Meals – $8,834 | Hotel – $34,769 | Subscriptions / Publications – $2,699 |
| Car Rental –$254 | Hotel Tips – $194 | Taxi – $2,700 |
| Contributions – $1,963 | Meals (Employee Traveling) – $4,847 | Telephone – $5,323 |
| Dues/Memberships – $18,197 | Meetings – Conventions – $15,880 | Tolls / Road Charges – $644 |
| Employee Fringe Benefits – $350 | Non-Reimbursable / Personal – $1,782 | United Way Campaign – $94 |
| Executive Car Maintenance – $13,814 | Office Supplies / Software – $335 | |
| Total – $183,120 | | |

The total charges recorded as "Non-Reimbursable/Personal Expense" on your credit card and cash reimbursements were $1,782 for the period involving transactions that were submitted between January 6, 2016, through August 14, 2022. The vendors in this category included CUNA 222, Agent Fees, and JetBlue.

The total of your credit card charges and cash reimbursements from the vendor, "The International Golf Club," were $18,313 for the period involving transactions that were submitted between January 6, 2016, through August 14, 2022.

The total charges recorded as "Executive Car Maintenance" on your credit card and cash reimbursements were $13,814 for the period involving transactions that were submitted between January 6, 2016, through August 14, 2022. The vendors included Infiniti of Nashua, Ron Bouchard's Nissan, and RMV E-Services.

WCU's Code of Conduct under Section III – "Conflict of Interest" states that "All employees, Directors, officers, agents, or attorneys of the Credit Union are prohibited by law from: (a) Soliciting for themselves or a third party (other than the Credit Union) anything of value from anyone in return for any business, service, or confidential information of the Credit Union; and (b) Accepting anything of value from anyone other than the Credit Union, in connection with the business of the Credit Union either before, during or after a transaction is discussed or consummated."[22]

WCU's Code of Conduct under Section III – "Conflict of Interest" further states "Insiders must avoid conflict of interest or the appearance of a conflict of interest which might result in personal benefit to the Insider, to members of the Insider's immediate family, or to anyone an Insider knows. Personal benefit is defined as any type of gift, favor, gratuity, service, entertainment, compensation, fee, loan, or legacy (except from a relative). No present or future personal benefit, which could be perceived as arising from a business relationship, may be accepted by an Insider from any member, present or prospective, or third-party vendor of the Credit Union. Conversely,

---

[22] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 4 of 10.




DocuSign Envelope ID: 24E043A8-AD88-4A7B-B790-AA93EF62CB5F

Douglas J. Petersen
Page 15

Insider must avoid offering or giving any personal benefit to others, on behalf of the Credit Union, if such offer or gift could be reasonably perceived as extravagant."[23]

WCU's Code of Conduct under Section III – "Conflict of Interest" also states that "In keeping with this policy, the giving or receiving of a gift is prohibited, unless the gift is of nominal value ($100 or less) and a refusal to give or accept it would be discourteous. In each case where an Insider is offered or has accepted anything of value in excess of the $100 limitation, with the exception of loans from other financial institutions to finance proper and usual activities, disclosure must be made in writing to the Credit Union's VP, HR and, if appropriate, the President and CEO. The facts and circumstances of each case will be considered, and a determination will be made as to whether or not acceptance is permitted under applicable laws and regulations."[24]

WCU's Code of Conduct under Section III – "Conflict of Interest" finally states that "Normal business entertainment is a customary and acceptable activity and, accordingly, not prohibited under this Policy. The value of such entertainment, however, must be reasonable and not so expensive as to place the employee under obligation."[25]

WCU's Code of Conduct under Section IV – "Gifts and the Bank Bribery Act; Disclosure Requirements" states that "In each case where a Credit Union employee is offered or has accepted anything of value in excess of the $100 limitation, with the exception of loans from other financial institutions to finance proper and usual activities, disclosure must be made in writing to the Credit Union's VP, HR and, if appropriate, the President/CEO. The facts and circumstances of each case will be considered, and a determination will be made as to whether or not acceptance is permitted under applicable laws and regulations."[26]

WCU has an "Accounts Payable & Expense Reimbursement Policy," which states that "The purpose of the Accounts Payable & Expense Reimbursement Policy is to establish definitive guidelines relative to capital and operational expenses incurred on behalf of Workers' Credit Union (the 'Credit Union'), and for the reimbursement of travel, entertainment and incidental expenses."[27]

"It is the policy of the Credit Union to reimburse Employees for legitimate expenses incurred in the execution of business related duties. Employees must use the Concur expense processing systems when submitting requests for reimbursement. Reimbursement will be contingent upon compliance with IRS guidelines and the following information and supporting documents must be included:

- Date and place of business expense;

- Name of individual(s) incurring the expense(s);

- Reason for the expense;

- Approval by authorized manager (manager or delegate's approval required for all requests, Board Chair signature required for all requests submitted by President/CEO and Board members, and expense classification(s);

- Applicable receipt(s)

- Supporting documentation must be attached to the expense report."

"Business travel and entertainment expenses are reimbursable expenses that are incurred by employees for purposes that are reasonable and appropriate and provide a direct benefit to the Credit Union."

---

[23] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 4 of 10.
[24] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 5 of 10.
[25] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 5 of 10.
[26] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 6 of 10.
[27] WCU's Accounts Payable & Expense Reimbursement Policy, May 23, 2017.





119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618

DocuSign Envelope ID: 24E043A8-AD88-4A7B-B79C-AA93EF62CBBF

Douglas J. Petersen
Page 16

- "Good Judgment: This policy provides guidelines to help employees exercise good judgment when traveling and incurring business-related expenses for reimbursement. It is expected that employees will use their 'good judgment' in these situations, meaning that they should exercise common sense, act professionally, and with sound business ethics to guide their actions. When uncertain, employees should seek clarification from their supervisors for approval or disapproval of eligibility for reimbursement of expenses before actually incurring the expense. If no prior approval is received, then the reimbursement may be denied."

- "Reimbursement: Reimbursement may refer to either funds reimbursed by the Credit Union to employees who incur expenses for business and entertainment purposes using their own credit card or personal funds; or, for expenses paid by use of a Workers' Credit Union corporate credit card."

- "Supervisor: supervisor is the person who has budgetary approval authority for the employee incurring the reimbursable expense. Depending on the position of the employee incurring the business-related expense, the term 'supervisor' may refer to a member of the upper, senior or executive management teams, or the Board of Directors, Executive Committee or Chairman of the Board, as appropriate."

As the CEO, managing and supervising all employees of WCU, you had an obligation to use your WCU-issued credit card properly, to record expenses and to be transparent in all matters involving WCU expenses. In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

11. <u>Mr. Smith received benefits from the use of his WCU-issued credit card. For example, Mr. Smith was typically reimbursed for his travel-related expenses by WCU when he attended events sponsored by Performance Trust. These credit card transactions totaled approximately $72,000 for the period from June 2, 2016, through May 22, 2023. You directly or indirectly approved Mr. Smith's misuse of his WCU-issued credit card and violation of WCU's Accounts Payable & Expense Policy.</u>

Mr. Smith was provided access to one WCU credit card, which was referred to as "Elan VISA Corporate Card IBCP – US." The total charges on Mr. Smith's WCU credit card were $135,549 for the period involving transactions between February 17, 2016, through August 21, 2022. The total charges on Mr. Smith's WCU credit card were $28,457 for the period involving transactions between August 26, 2022. The total cash reimbursements payments to Mr. Smith were only $2,269 for the period involving transactions that were submitted between June 2, 2016, through August 21, 2022. Thus, Mr. Smith apparently primarily used his WCU credit card for expense reimbursements.

Mr. Smith was typically reimbursed for his travel-related expenses (such as lodging and airfare) by WCU when he attended events sponsored by Performance Trust. Performance Trust held an annual event in June known as The Advanced Course® ("AC"), which typically was a four-day event that offered a golfing event on Tuesday and three-day training from Wednesday through Friday. Performance Trust also held Performance Trust University ("PTU") events throughout the year. Performance Trust typically would not pay for its attendees' airfare, lodging, ground transportation, and travel insurance costs for attending the events sponsored by them. These identified credit card and cash reimbursement transactions (excluding non-reimbursable / personal expenses) for Mr. Smith's golf, airfare, lodging, meals and entertainment (golf events), parking, mileage, ground transportation, staff, meetings/conventions, and miscellaneous expenses totaled approximately $72,000 for the period from June 2, 2016, through May 22, 2023.

WCU's Code of Conduct under Section III – "Conflict of Interest" states that "All employees, Directors, officers, agents, or attorneys of the Credit Union are prohibited by law from:





119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618

Douglas J. Petersen
Page 17

- Soliciting for themselves or a third party (other than the Credit Union) anything of value from anyone in return for any business, service, or confidential information of the Credit Union; and

- Accepting anything of value from anyone other than the Credit Union, in connection with the business of the Credit Union either before, during or after a transaction is discussed or consummated."[28]

WCU's Code of Conduct under Section III – "Conflict of Interest" further states "Insiders must avoid conflict of interest or the appearance of a conflict of interest which might result in personal benefit to the Insider, to members of the Insider's immediate family, or to anyone an Insider knows. Personal benefit is defined as any type of gift, favor, gratuity, service, entertainment, compensation, fee, loan, or legacy (except from a relative). No present or future personal benefit, which could be perceived as arising from a business relationship, may be accepted by an Insider from any member, present or prospective, or third-party vendor of the Credit Union. Conversely, Insider must avoid offering or giving any personal benefit to others, on behalf of the Credit Union, if such offer or gift could be reasonably perceived as extravagant."[29]

WCU's Code of Conduct under Section III – "Conflict of Interest" also states that "In keeping with this policy, the giving or receiving of a gift is prohibited, unless the gift is of nominal value ($100 or less) and a refusal to give or accept it would be discourteous. In each case where an Insider is offered or has accepted anything of value in excess of the $100 limitation, with the exception of loans from other financial institutions to finance proper and usual activities, disclosure must be made in writing to the Credit Union's VP, HR and, if appropriate, the President and CEO. The facts and circumstances of each case will be considered, and a determination will be made as to whether or not acceptance is permitted under applicable laws and regulations."[30]

WCU's Code of Conduct under Section III – "Conflict of Interest" finally states that "Normal business entertainment is a customary and acceptable activity and, accordingly, not prohibited under this Policy. The value of such entertainment, however, must be reasonable and not so expensive as to place the employee under obligation."[31]

WCU's Code of Conduct under Section IV – "Gifts and the Bank Bribery Act; Disclosure Requirements" states that "In each case where a Credit Union employee is offered or has accepted anything of value in excess of the $100 limitation, with the exception of loans from other financial institutions to finance proper and usual activities, disclosure must be made in writing to the Credit Union's VP, HR and, if appropriate, the President/CEO. The facts and circumstances of each case will be considered, and a determination will be made as to whether or not acceptance is permitted under applicable laws and regulations."[32]

WCU's "Accounts Payable & Expense Reimbursement Policy," discussed in the immediately prior section, applies equally to Mr. Smith for his expenses and reimbursements from WCU, and also to you, as Mr. Smith's supervisor.

As Mr. Smith's supervisor, you had duties to oversee his use of WCU credit card and his expenses and reimburses.  You also had an obligation to oversee, manage and enforce WCU's Code of Conduct and potential bank bribery laws.  You approved, directly or indirectly, Mr. Smith's clear and serious violations of the WCU Code of Conduct and Policies.  In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

12. <u>You misled the Board on the budgeted costs associated with WCU's new headquarters.</u>

---

[28] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 4 of 10.
[29] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 4 of 10.
[30] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 5 of 10.
[31] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 5 of 10.
[32] WCU Code of Conduct, ERM Approval Date: May 17, 2022, 6 of 10.





Douglas J. Petersen
Page 18

You represented to the Board that the budget for the additional building costs for the construction of WCU's new headquarters was not to exceed $13.6 million plus a five percent contingency instead of the actual costs which totaled approximately $20 million.

WCU purchased the Littleton property in 2015 for $6.4 million from the Littleton Office Center Associates LLP, which included the office building and land where the future branch was to go.

According to WCU's notes to its audited financial statements, below is a summary of WCU's investment in premises and equipment from December 31, 2018, through 2020:

| WCU | As of December 31, | | |
|---|---|---|---|
| **Premises & Equipment** | **2018** | **2019** | **2020** |
| Land | $5,009,000 | $4,763,000 | $4,737,0000 |
| Buildings & Improvements | 21,670,000 | 19,535,000 | 36,151,000 |
| Furniture & Fixtures | 7,272,000 | 7,510,000 | 14,797,000 |
| Construction-In-Progress | 1,277,000 | 9,722,000 | 1,092,000 |
| **Total (at Cost)** | **$35,228,000** | **$41,530,000** | **$56,777,000** |

Between December 31, 2018, and December 31, 2020, WCU's total investment in its premises and equipment grew from $35.23 million to $56.78 million or an increase of $21.55 million (approximately 61%).

As CEO, you had an obligation to oversee, manage and correctly advise the Board on the actual costs of the new headquarters. In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

13. <u>You lacked transparency with WCU's Board on a proposed merger with USAlliance in 2021.</u>

You did not conduct proper due diligence of USAlliance's financial, operational, legal, and other risks as required by the NCUA in connection with the proposed merger. A Letter of Intent was sent by the Board Chair of WCU to USAlliance dated July 22, 2021. An "Analysis of Potential Credit Union Merger," for WCU and USAlliance was prepared in January 2021 by Dennis Dollar ("Mr. Dollar") of Dollar Associates, LLC ("Dollar Associates"). This presentation stated that a number of questions needed to be answered during the due diligence stage and in advance of any proposed merger agreement. This presentation also discussed the benefits of the merger between WCU and USAlliance.

The NCUA requires credit unions to complete a merger application, which must be approved by the NCUA.[33] The NCUA states that "Due diligence reports from both corporates should be included. Where a conflict of interest may arise from a proposed consolidation, due diligence should be performed by an independent party. If the due diligence is contracted to a third party, the engagement should be supported by agreed upon procedures. A due diligence review encompasses items such as:

- Reviewing significant member, vendor, and management agreements for potential adverse impact;

- Determining if existing contracts can be transferred;

---

[33] GuidelinesCorporateMergerApplication.pdf (ncua.gov)




Douglas J. Petersen
Page 19

- Concluding whether revised member agreements are needed or will addendums suffice as new products and services are deployed;

- Member notification requirements for account structure equalization;

- Assessing whether the proposed merger will trigger any liability under existing contracts;

- Determining whether UCC statements must be re-filed;

- Determining whether any undisclosed financial or legal liabilities exist; and

- Validation of financial information and any off-balance sheet positions."[34]

As the CEO of WCU, you did not only conduct insufficient due diligence in connection with the proposed merger with USAlliance, but you prevented other WCU personnel from doing so. In sum, these foregoing and related issues constitute an independent basis for finding cause for the denial of your claim for benefits under: (a) the SERP, Section 1.6(i)-(v); and (b) your Executive Employment Agreement dated as of December 2021, Section 4.2.(b)(i), (ii), (iii), (iv), (vi).

**Additional Information or Material Necessary to Perfect Claim**

Please provide any additional information or material addressing the above-identified reasons for the denial of your claim for benefits under the SERP.  In addition, please provide any additional information or material you believe supports your claim for benefits under the SERP.

**Review Procedures and Time Limits**

Attached hereto is the SERP dated as of December 1, 2021.  Article 10 governs the claims and review procedures. Section 10.2 of the SERP explains the review procedures and the time limits applicable for such procedures.  Specifically, based on this denial, you have the opportunity for a full and fair review by the Administrator of this denial. *See* SERP, Section 10.2.  To initiate a review of this denial, you must, within 60 days after your receipt of this denial, file with the Administrator a written request for review. *See* SERP, Section 10.2.1.  You will then have the opportunity to submit written comments, documents, records and other information relating to your claim. *See* SERP, Section 10.2.2.  Finally, the Board will also provide you, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant (as defined in the applicable ERIS regulations) to your claim for benefits.

If you invoke this review procedure, the Board, as Administrator, must take into account all materials and information you submit relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

If you request a review of this denial, the Board, as Administrator, must respond in writing to you within 60 days after receiving your request for review.  If the Board, as Administrator, determines that special circumstances require additional time for processing the claim, the Board can extend the response period by an additional 60 days by notifying you in writing, prior to the end of the initial 60-day period, that an additional period is required. The notice of extension must set forth the special circumstances and the date by which the Administrator expects to render its decision.  The Board, as Administrator, must notify you of its final decision on review.

Note that the WCU Board is the Administrator under the SERP, so any filing with the Administrator should follow the notice provisions in the SERP – specifically Section 11.1 of the SERP, which requires the request for review to be in writing and which will be deemed to have been given when it is delivered.  The written request can be delivered personally to the Board or sent to the Board by overnight courier addressed to the WCU Board at WCU's current address, which is: 119 Russell Street, Littleton, MA 01460.

---

[34] GuidelinesCorporateMergerApplication.pdf (ncua.gov)




DocuSign Envelope ID: 24E043A8-AB88-4A7B-B798-AA93EF62CB5E

Douglas J. Petersen
Page 20

**Right to Bring Civil Action Under Section 502(a)**

Finally, as referenced in Section 10.1.3 of the SERP dated as of December 1, 2021, you have the right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on review.

Thank you for your attention to this matter.

Sincerely,

*Nilesh V. Gunda*
D6BC1F6ACBD74B3...

Nilesh Gunda
Board Chair


cc:    Jay Champion
       Johan Seo
       Robert Leger

WORKERS
C R E D I T U N I O N

119 Russell Street, Littleton, MA 01460 | 800.221.4020 | wcu.com | NMLS #472618

